THE PEOPLE OF THE STATE OF NEW YORK, Plaintiff, *v.* JOSEPH REVOLTA, Defendant.

City Magistrates' Court of New York, Borough of Brooklyn, Ninth District, April 14, 1937.

*W. F. X. Geoghan, District Attorney [Samuel A. Pease, Deputy Assistant District Attorney]*, for the plaintiff.

*Jacob Siegfried*, for the defendant.

RUDICH, C. M. The defendant is charged with violating section 974 of the Penal Law in that on February 18, 1937, he had in his possession a slip of paper containing ten numbers which have been conclusively described as policy numbers, representing a total wager of one dollar and fifty cents. The defendant made no admissions when apprehended. The arresting officer could not state, nor did the paper indicate, whether the numbers had been played or were still to be played. The circumstances indi-

cated that the defendant was a player rather than a collector. He did not testify in his behalf, but moved for dismissal at the end of the People's case on the ground that mere possession of a policy slip by a player does not constitute a violation of law.

That part of the statute which is material to the point thus raised reads as follows: "A person * * * who shall have in his possession, knowingly, any writing, paper or document, representing or being a record of any chance, share or interest in numbers sold, drawn or selected, or to be drawn or selected, or in what is commonly called 'policy,' or in the nature of a bet, wager, or insurance, upon the drawing or selection, or the drawn or selected numbers of any public or private lottery; or any paper, print, writing, number, device, policy slip or article of any kind such as is commonly used in carrying on, promoting or playing the game commonly called 'policy' * * * is a common gambler, and guilty of a misdemeanor."

A casual reading of this statute would lead one to conclude that mere possession of policy slips by *any one* is a crime. That seemed to be the prevailing ruling of the courts until the recent case of *People* v. *Johnson* (244 App. Div. 712), decided in the First Department in April, 1935. There the defendant admitted that when she was arrested she had a policy slip in her hand and had intended to wager ten cents on the numbers written thereon. After she was convicted in the Court of Special Sessions she appealed to the Appellate Division. The district attorney, on the appeal, squarely raised the point, insisting that a player of policy numbers is as guilty as the collector, banker or promoter. To quote from his brief: "Policy, therefore, of all gambling games, was singled out by the Legislature for extermination. Irrespective of the success obtained by the Legislature in its extermination, the intent was to reach the player as well as the promoter, since the fear of arrest to the player would work as a detriment in his indulgence in the game."

The court, however, apparently, did not agree with this contention, for it reversed the conviction and discharged the defendant. It is regrettable that it wrote no opinion in that case; however, in view of the action of the court after the insistence of the district attorney, this case is a controlling ruling upholding the contention of the defendant in the case at bar.

In December of the same year, only a few months after the *Johnson* case, the same Appellate Division was again confronted with the question whether mere possession of one slip constitutes a violation of this section. That case was *People* v. *Navarette* (245 App. Div. 669). Here, however, the circumstances indi-

cated that the defendant was a collector rather than a player, and this time the conviction was sustained.

Counsel for the defendant in the case at bar has furnished this court with a certified copy of the minutes in the case of *People v. Christie* (unreported), in which he represented the defendant, and which was tried in the Court of Special Sessions in Queens county on January 4, 1937. There the defendant frankly admitted that he was found in possession of a policy slip containing two numbers, with which was wrapped up sixty cents in coin; that he wrote the numbers himself, and had intended to wager the money on those numbers, but that the officer had placed him under arrest before the slip and the money could be turned over to the collector. At the close of the entire case the defendant moved for acquittal on the ground that the prosecution " failed to prove a case beyond a reasonable doubt." The motion was granted. This case likewise, though unreported, seems to lend support to the contention of the defendant here. Counsel does not assert that the liberal attitude shown in this case is the usual one in the Court of Special Sessions, but he does insist that some other cases with like facts have been similarly disposed of in that court, the outcome depending somewhat upon the personnel of the bench when a particular case is heard.

A section of the Penal Law that is analogous to section 974 is section 970, which defines as " common gambler " a person " who engages as dealer, game-keeper, or player in any gambling or banking game." Despite the explicit inclusion of a player in that definition, the Court of Appeals, in *People v. Bright* (203 N. Y. 73), held that occasional participation in a game of poker by *a player* does not make him a common gambler on a parity with the professional dealer. In *People v. Emerson* (6 N. Y. Crim. Rep. 157) it was held that one who purchases a lottery ticket is guilty of no crime. In the recent case of *Watts v. Malatesta* (262 N. Y. 80, at p. 82) the Court of Appeals said: " But casual betting or gambling by individuals as distinguished from betting or gambling as a business or profession, is not a crime. * * * The evil which the law chiefly condemns (New York Const. art. I, § 9) and makes criminal (Penal Law, art. 88) is betting and gambling organized and carried on as a systematic business. The reason seems obvious. Curb the professional with his constant offer of temptation coupled with ready opportunity, and you have to a large extent controlled the evil. It is clear that in the eye of the law the professional gambler and his customer do not stand on the same plane. They are not *in pari delicto*."

So much for the authorities on the precise question involved. Historically, this differentiation between the occasional player and the professional goes back many centuries. The Jewish Encyclopedia, title " Gambling," says that among the ancient Israelites no mention is made of games of chance, and no provision was made against them until the period of the Mishnah. With the introduction of foreign customs in the latter part of the Second Temple, playing with dice (" kubya "), the popular game of antiquity, was adopted by the Jews. The rabbis were bitterly opposed to these imported fashions and looked upon them with intense aversion. The Mishnah went so far as to disqualify all gamblers from testifying in courts of justice. Nevertheless, while the general tendency of the rabbis was to forbid all manner of gambling games, they were careful to distinguish between those persons who played for pastime and those who made gambling their profession. So, too, in the civilizations and eras that followed this period the same distinction was made; and in our common law, based on customs and habits in England, mere gambling as such, though regarded with disfavor, was not a crime.

The passion for gambling permeates all strata of society. Among the poor its psychological root may be found in the dull and prolonged monotony of uninteresting drudgery which makes up the normal workaday life of large masses, affording but little scope for spontaneity or self-expression. Gambling furnishes an escape — hence arises their instinctive zest for the unexpected and the hazardous, as salt to an otherwise tasteless fare. In addition, the desire for gain and the hope that fortune will smile upon them, so that with the winnings they may obtain something hitherto unobtainable because of limited income, are strong motivating forces. At the other end of the economic scale, in the leisure classes, we find that the ennui resulting from idleness and dilettantism furnishes the same stimuli to gambling and other excesses as do monotony and acquisitiveness among the poor. In between, among people of the so-called middle classes, the spread between earnings and necessary spending is greater than among the poor. Having more money at their disposal than is absolutely needed for necessities, they have the wherewithal for speculation. The desire to increase one's wealth in that manner, though operating with diminishing force, is still present; and added to that, the gaming impulse is sometimes stimulated by the conscious or unconscious aping of the customs and habits of those in the upper levels.

Thus, assured of generous patronage from all walks of life, the inventive genius of man has devised many plans and ways by which

those who like to gamble may satisfy their desires. It is unnecessary here to describe these various forms. Each has its countless followers of both sexes, with large numbers of people indulging in more than one form. It is evident, therefore, that gaming is too widespread and too general for society to shun its devotees as pariahs; there would be too many such outcasts. Of course, it cannot be defended upon ethical grounds. Moralists and economists decry the vice as a canker upon our social structure. They condemn it as leading to habits of recklessness, waste and idleness. They deplore it because it cultivates a distaste for honest labor and a desire to obtain riches without working for them. As we approach an ideal state of living, gambling may die — its demise hastened by an aroused public conscience and by a more general realization of its harmfulness; or perhaps the solution may be found in channeling the passion into more useful fields of endeavor. Until that day arrives, however, or until our law-making body expressly decrees otherwise, people have the legal right to gamble, and that right cannot be restricted to special forms or to certain classes of people. To permit some to hazard fortunes on the fluctuations of the stock market; to permit others to wager, in sepulchers of plush and gold, hundreds of dollars on the turn of a card or the spin of a roulette wheel; to permit still others to bet varying numbers of dollars on the outcome of a horse race; to hold immune from prosecution purchasers of lottery and sweepstakes tickets and even tax their winnings as income — in short, to tolerate participation in all other forms of gambling, but to deny to persons of limited means the right to wager a few cents on the selection of policy numbers, is in effect class discrimination without logic or reason behind it. None of these groups of chance-takers is any wiser than the others — all may be properly regarded as foolish — but the foolishness of the policy player is no more anti-social than that of the rest and, therefore, cannot be regarded as criminal in the light of present day public opinion.

The defendant is discharged.